# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 13-CR-951 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| LAURANCE H. FREED | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Laurance H. Freed's consolidated motion [134] for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure and for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. For the following reasons, the motion [134] is denied. The other pending motions [91], [104], [108], [121] are stricken as moot.

## I.  Background

On February 24, 2016, a jury found Defendant guilty of bank fraud in violation of 18 U.S.C. § 1344 (Counts One, Six, and Seven), mail fraud in violation of 18 U.S.C. § 1341 (Count Eight), and making false statements to a bank in violation of 18 U.S.C. § 1014 (Counts Ten, Eleven, Fourteen, and Sixteen). [126.] The jury acquitted Defendant on the remaining counts, which were bank fraud counts (Counts Two to Five), false statements to a bank counts (Counts Twelve and Thirteen), and a wire fraud count (Count Nine). [126.] On April 13, 2016 Defendant filed his consolidated motion for a new trial and for a judgment of acquittal. [134; see also 142 (Government's response); 143 (Freed's reply).]

II. Analysis

A. Motion for a Judgment of Acquittal

Under Federal Rule of Criminal Procedure 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." In reviewing a motion for a judgment of acquittal, the Court "construe[s] the evidence in the light most favorable to the government, asking whether a rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *United States v. Weimert*, 819 F.3d 351, 354 (7th Cir. 2016). The Court's task is not to "reweigh the evidence or invade the jury's province of assessing credibility." *United States v. Peterson*, 823 F.3d 1113, 1120 (7th Cir. 2016) (citation and internal quotation marks omitted). Rather, the Court "will overturn the jury's verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id.* (citation and internal quotation marks omitted). Given the deference given to jury determinations on evidentiary matters, the Seventh Circuit has stressed that defendants bringing Rule 29 motions face "a nearly insurmountable hurdle." *Weimert*, 813 F.3d at 354 (citation and internal quotation marks omitted).

Defendant makes three arguments in support of his motion for a judgment of acquittal. First, Defendant argues that there was insufficient evidence to prove that he acted with intent to defraud for Count One (bank fraud). Second, he contends that there was insufficient evidence to show that the executions charged in Counts Six and Seven (bank fraud) and Count Eight (mail fraud) could have furthered a scheme to defraud the banks. Third, Defendant argues that there was insufficient evidence to prove that he knowingly made any false statements for Counts Ten,

Eleven, Fourteen, and Sixteen (making false statements to a bank). The Court will address each argument in turn.

### 1. Intent to Defraud: Count One

Defendant argues that the Court should acquit him on Count One (bank fraud) because there was insufficient evidence to establish that he acted with intent to defraud. Intent to defraud must be proven to obtain a conviction for bank fraud under 18 U.S.C. § 1344. *United States v. Moede*, 48 F.3d 238, 241 (7th Cir. 1995). The Seventh Circuit has defined "intent to defraud" as "acting willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Jackson*, 540 F.3d 578, 594 (7th Cir. 2008) (citation and internal quotation marks omitted). The Government may prove intent to defraud using circumstantial evidence and inferences drawn from the scheme itself. *Id.*

The bank fraud execution charged in Count One related to the double pledge of the Uptown Goldblatt's Venture ("UGV") TIF project notes ("TIF notes"). This execution was purportedly accomplished through a PowerPoint slide entitled "Line of Credit Collateral" contained in the presentations that Defendant's business, Joseph Freed and Associates ("JFA"), made to a bank consortium led by Bank of America (collectively, "Bank of America"). The Government argued at trial that the slide falsely represented that JFA owned one hundred percent of the TIF notes, that the cost to sell the notes was $0, and that the proceeds of the sale would be $7,698,000.[1] According to Defendant, the slide contained no affirmative misrepresentations concerning the TIF notes. Defendant contends that the only evidence the Government produced concerning Defendant's alleged intent to defraud Bank of America regarding the double pledge

---

[1] The slide states that for the Uptown TIF project notes, "% JFA" is 100%, "Costs of Sale" is 0, and "Approx. Proceeds" are $7,698,000.

3

was that Defendant knew about the double pledge and that he did not inform Bank of America about the double pledge despite multiple opportunities to do so. Defendant argues that this is not enough to support a finding of intent to defraud.

The Court rejects Defendant's claim that there were no affirmative misrepresentations in JFA's PowerPoint presentation to Bank of America. During his direct examination, Gary Katunas of Bank of America identified affirmative false statements on the "Line of Credit Collateral" PowerPoint slide. Specifically, the slide represented that the sale value and proceeds of the sale of the TIF notes would be $7,698,000.[2] Katunas explained to the jury that this was a false representation because the TIF notes were double pledged—they were previously pledged to Cole Taylor Bank. Thus, $7,698,000 overstated the sale value and proceeds by approximately $2,100,000, which was the value of the TIF notes that had been pledged to Cole Taylor.

Defendant argues that Katunas "acknowledged during cross-examination that the affirmative representations on the PowerPoint slide were accurate, although he appeared to contend that the fact of the double pledge should have been disclosed 'somewhere' on that slide." [134, at 2.] In Defendant's view, because of Katunas' statements during cross-examination, there was insufficient evidence from which a reasonable jury could find intent to defraud beyond a reasonable doubt. Katunas stated during cross-examination that he understood the "Sale Value" of the TIF notes on the slide to be based on the notes' appraised market value. Katunas also acknowledged that "Cost of Sale" is understood to be a standard 1% allowance for real estate brokerage commissions and legal fees for the sale of real estate, and thus this expense was inapplicable to the TIF notes. He further testified that the "% JFA" line reflected Defendant's ownership vis-à-vis any partners in those ventures, and because Defendant did not

---

[2] The slide indicates that the "Sale Value" was $7,698,000 and that the "Cost of Sale" was $0, thus the "Proceeds," "Net Proceeds," and "Approx. Proceeds" were stated to be $7,698,000.

have partners in the TIF notes, the 100% figure was accurate. Katunas also stated on cross-examination that the net proceeds and approximate proceeds line items on the slide were "mathematical calculations based on the above line items."

Defendant's argument fails because considering Katunas' statements during cross-examination in the context of the rest of his testimony and viewing the evidence in the light most favorable to the government, there was sufficient evidence to support the jury's finding of intent to defraud. Simply put, a rational jury could have credited Katunas' testimony on direct examination and discounted his cross-examination. *Peterson*, 823 F.3d at 1120 (noting that in reviewing a motion for a judgment of acquittal, the Court's task is not to "reweigh the evidence or invade the jury's province of assessing credibility").

Defendant's argument also overlooks much of the evidence of Defendant's motive to commit fraud in light of his financial problems and Defendant's lies to Bank of America about the value of the TIF notes. This evidence also could have persuaded a reasonable jury that Defendant acted with intent to defraud.

To begin with, a reasonable jury could conclude that Defendant's dire financial condition motivated his fraud. According to testimony at trial, during at least 2008 and 2009, Defendant convened regular cash meetings with JFA executives to discuss JFA's liquidity problems and how to meet the ongoing obligations of the company. Starting in early 2008, Defendant began to direct employees to withdraw funds from a bank account for the Streets of Woodfield joint venture with Kimco in order to fund JFA operating expenses, but Defendant did not discuss these withdrawals with Kimco despite the fact that Kimco owned forty-five percent of Streets of Woodfield. JFA initially accounted for these withdrawals in a way that buried the transactions at month's end in a category called "A/R unbilled." JFA later changed the accounting for the

withdrawals to describe them as "A/R Affil Eliminating Loan," but David Henry of Kimco testified at trial that Defendant never asked Kimco for a loan, and Kimco never agreed to loan any money to Defendant. In September 2008, JFA's CFO Al O'Donnell resigned from his position at JFA and notified Defendant that it was not JFA's extraordinary financial problems that caused him to resign. Rather, O'Donnell explained, his resignation was compelled in part by "the continued use of partnership cash [*i.e.*, the Streets of Woodfield / Kimco withdrawals] as a funding source for ongoing obligations of the company."

Additionally, the jury reasonably could have considered the fact that Defendant, who had a net worth of approximately $95 million, had personally guaranteed more than $300 million of JFA's loans. By November 2008, Defendant stopped making payments on a $105 million line of credit, known as "the big line of credit," that JFA had with Bank of America. JFA did not make any more payments on the big line of credit in late 2008, did not make any payments in 2009, and ultimately defaulted on the loan. JFA also failed to make its second installment of property taxes on a property it owned called Evanston Plaza. Therefore, there was ample evidence that Defendant and his company were struggling financially, and a reasonable jury could conclude that this motivated Defendant's fraud. See *United States v. Grandinetti*, 891 F.2d 1302, 1306 (7th Cir. 1989) (holding that the circumstantial evidence clearly supported a finding of the defendant's intent to defraud financial institutions where it could be reasonably inferred that the defendant knew of his company's financial problems and bore the lion's share of the company's losses).

Further, the government presented evidence of Defendant's misrepresentations to Bank of America about the collateral supporting the big line of credit in an effort to conceal the full extent of JFA's financial problems and obtain an additional $10 million. A reasonable jury could

infer intent to defraud from this evidence as well. In sum, there was sufficient evidence for a rational jury to find that Defendant acted with intent to defraud for Count One.

### 2. Furthered the Scheme to Defraud: Counts Six, Seven, and Eight

Defendant's next argument is that the executions charged in Counts Six and Seven (bank fraud) and in Count Eight (mail fraud) could not have furthered the scheme to defraud the banks. The executions for these counts were based on Defendant's submission of affidavits to the City of Chicago, which were purportedly used to obtain TIF payments to which JFA was not entitled in order to buy time with creditors. The Court concludes that there was sufficient evidence for a reasonable jury to find that Defendant's submission of false affidavits to the City furthered the scheme to defraud.

In the affidavits to the City, Defendant swore that the representations and warranties contained in the UGV Redevelopment Agreement ("RDA") were true and accurate and that no default had occurred. [See GX 2009 Request for Payments (execution for Count Six); 2010 Request for Payments (execution for Count Seven).] One of the representations and warranties was that JFA was not in default with respect to any agreement related to the borrowing of money. [See GX UGV Redevelopment Agreement, at 33–34.] A default under lender financing, which included the Cole Taylor loan, caused a default under the RDA. [See GX UGV Redevelopment Agreement, at 57.]

At trial, the Government presented ample evidence that the affidavits were false and that Defendant knew they were false. First of all, when Defendant signed the affidavits to the City in December 2009 and December 2010, JFA had failed to pay many monthly installments on the big line of credit, and Bank of America had provided Defendant with multiple written notices of default. Thus, JFA was in breach of the loan agreement, and the representations and warranties

7

in the RDA—which included a representation that JFA was not in default with respect to any agreement related to the borrowing of money—were not true and accurate. Additionally, JFA's double pledge of the TIF notes to Bank of America violated a covenant in JFA's loan agreement with Cole Taylor, which was an event of default under the Cole Taylor financing, thus causing a default under the RDA. At the time Defendant signed the affidavits charged as the execution in Counts Six, Seven, and Eight, he had already admitted to Cole Taylor in writing that JFA had defaulted on the Cole Taylor loan due to the double pledge. [See 5/20/09 2nd Amendment of Loan Docs, at 6; 9/17/09 3rd Amendment of Loan Docs, at 6.]

The false affidavits furthered the scheme to defraud by attempting to prevent the City and the banks from discovering the fraud scheme. A truthful affidavit would have alerted the City and the banks that the representations and warranties in the RDA were not true and accurate and that a default had occurred. This could have caused the banks to investigate. Katunas testified that if Bank of America had known about Defendant's lies sooner, it would have sought to foreclose sooner and mitigate its losses.

Defendant focuses on the Government's statement in closing arguments that the default in the RDA caused by the double pledge "made [the TIF notes] worthless" to the banks. He argues that if the TIF notes were worthless to the banks because of Defendant's breaches of the loan agreements, then the alleged failure to disclose those breaches in the affidavits did not further any scheme to defraud the banks. This argument fails because a reasonable jury could have concluded that the TIF notes had potential value for Cole Taylor or Bank of America, both of which were victims of the bank fraud scheme. Defendant used the false affidavits to obtain TIF payments to which JFA was not entitled. However, Cole Taylor had a claim to the TIF notes proceeds, since Defendant has defaulted on the loan agreement with Cole Taylor due to the

double pledge and JFA had pledged the TIF notes to Cole Taylor as collateral for the loan. Bank of America also had a claim to the TIF notes under. [GX 6/14/10 Katunas Letter re: TIF; 3/10 Harder email' GX 4/28/10 Eager Letter.] Thus, by submitting false affidavits and concealing multiple instances of breach and default, Defendant furthered the scheme to defraud.

Defendant also argues that there was insufficient evidence that he knew that the affidavits were false. While conceding that a provision in the RDA states that a default under "lender financing," such as the Cole Taylor loan, constitutes an event of default under the RDA, Defendant contends that "there was no evidence that defendant himself understood that distinction" in the "voluminous and abstruse" RDA. However, a reasonable jury could conclude that Defendant—who was the owner and president of JFA, had years of experience as a developer of major projects, and signed most of the agreements at issue—read and understood the contracts that were worth millions of dollars to his company.

### 3. False Statements: Counts Ten, Eleven, Fourteen, and Sixteen

Finally, Defendant argues that the Court should enter a judgment of acquittal because there was insufficient evidence to establish that Defendant made false statements to a bank in violation of 18 U.S.C. § 1014 as charged in Counts Ten and Eleven (false statements regarding the double pledge), Count Fourteen (false statement in Cole Taylor loan agreement), and Count Sixteen (false statement to Bank of America under the amended construction loan agreement). The Court concludes that there was sufficient evidence for a reasonable jury to find Defendant guilty of these counts beyond a reasonable doubt.

Under § 1014, it is a crime to "'knowingly make[ ] any false statement or report * * * for the purpose of influencing in any way the action of' a federally insured institution." *United States v. Johnson*, 729 F.3d 710, 714 (7th Cir. 2013) (quoting 18 U.S.C. § 1014). The false

statement charges in Counts Ten and Eleven are based on representations concerning the TIF notes. Count Ten, like Count One, is based on the "Line of Collateral Slide" in the December 2008 presentation to Bank of America and alleges that the representations that JFA owned one hundred percent of the TIF notes, that the cost to sell the notes was $0, and that the proceeds of the sale would be $7,698,000 were false. Count Eleven makes the same allegations with regard to the January 2009 bank presentation. Defendant argues, as he did for Count One discussed above, that there were no false representations on the slide. He contends that "literal truth" is a complete defense to a false statement charge and again points to Katunas' testimony during cross-examination acknowledging that the terms used on the slide were all financial terms of art. However, as discussed above, given the evidence presented at trial and construing Katunas' testimony on direct and cross-examination in the light most favorable to the Government, a reasonable jury could conclude beyond a reasonable doubt that Defendant knowingly made false statements as charged in Counts Ten and Eleven.

Defendant also challenges the jury verdict in Count Fourteen. The false statement charge in Count Fourteen is premised on the following covenant in an amended loan agreement between UGV and Cole Taylor: "The Borrower and Co-Borrower covenant and agree to provide to [Cole Taylor] a release and termination of the [pledge of the TIF notes to Bank of America] by no later than October 31, 2009." [GX, 9/17/09 3rd Amendment of Loan docs, at ¶ 7(b).] At trial, the Government argued that the covenant was false because Defendant had no intention of asking Bank of America for a release or telling Bank of America about the double pledge of the TIF notes.

Defendant argues that the Government's evidence was insufficient to support a finding that Defendant knowing made a false statement. He notes that § 1014 prohibits the making of a

"false statement or report" but does not explicitly prohibit the making of a false promise, in contrast to the bank fraud statute, § 1344, which prohibits "false or fraudulent pretenses, representations, or promises." Defendant contends that the covenant at issue is at most a false promise, not a false statement. This argument is based on *Williams v. United States*, which involved check-kiting—"a scheme whereby false credit is obtained by the exchange and passing of worthless checks between two or more banks." 458 U.S. 279, 283 (1982). In *Williams*, the government argued that a check drawer is generally understood to represent that he currently has funds on deposit sufficient to cover the face value of the check. *Id.* at 285. Thus, in the government's view, if the drawer has insufficient funds in his account at the moment the check is presented, he effectively has made a "false statement" under § 1014. *Id.* at 285–86. The U.S. Supreme Court disagreed, explaining that "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false,'" and that each check did not "make any representation as to the state of petitioner's bank balance." *Id.* at 284–85. Defendant argues that since the Supreme Court recognized that a check is "simply a draft drawn on a bank and payable on demand, which contains an unconditional promise or order to pay," *id.* at 285 (internal citation and quotation marks omitted), a false promise is not sufficient for purposes of a § 1014 conviction.

The Court concludes that Defendant not entitled to a judgment of acquittal on this basis. Although *Williams* mentions in passing that a check contains a promise to pay, it does not stand for the proposition that a false promise cannot be a false statement. In rejecting a defendant's similar reliance on *Williams* in support of an argument that a promise was not a statement that could be true or false, the Fifth Circuit explained in *United States v. Shah*[3] that

---

[3] *Shah* involved 18 U.S.C. § 1001, which prohibits "false, fictitious or fraudulent statements or representations" on a matter "within the jurisdiction of any department of agency of the United States."

the issue in *Williams* was whether a check makes a statement at all, and if so, what statement. * * * The Court never suggests that a promise cannot, as a matter of law, be or contain a statement or representation. Instead, a check is not a statement because it is not "a factual assertion," because it does not "make any representation as to the state of petitioner's bank balance."

44 F.3d 285, 291 (5th Cir. 1995) (quoting *Williams*, 458 U.S at 285). The Court finds persuasive the Fifth Circuit's observation that "a promise to perform is * * * a representation of present intent" and that "[p]romises and representations are simply not mutually exclusive categories." *Id.* at 293. Thus, the plain terms of § 1014 cover the false promise Defendant made in the Cole Taylor loan agreement. See *Elmore v. United States*, 267 F.3d 595, 603 (4th Cir. 1959) (rejecting defendant's argument that "false statements" should be confined to "false statements of existing fact" and holding that "false statements" in the context of the Commodity Credit Corporation Act, 15 U.S.C. § 714m(a) covered "false and fraudulent promises which the maker does not intend to perform" because "a false promise fraudulently given amounts to a false statement of an existing intent"); *United States v. Sattar*, 272 F. Supp. 2d 348, 377–78 (S.D.N.Y. 2003) (holding that "a knowingly false promise, which is a knowingly false statement of present intent, can be a false statement within the meaning if 18 U.S.C. § 1001"); *Int'l CableTel Inc. v. Le Groupe Videotron Ltee*, 978 F. Supp. 483, 487 (S.D.N.Y. 1997) (noting that it is well settled under New York law that "if a promise was made with a preconceived and undisclosed intention of not performing it, is constitutes a misrepresentation of a material existing fact" (citation and internal quotation marks omitted)); cf. *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083,

---

Although the case at hand involves 18 U.S.C. §1014, which prohibits "any false statement or report," the analysis in *Shah* applies here. The language at issue in Shah was the defendant's statement in a bid solicitation that "[t]he prices in this offer * * * will not be knowingly disclosed by the offeror * * * to any other offeror or competitor before * * * contract award." Defendant argued that this was not a false statement under 18 U.S.C. § 1001 because it was not a statement that could be true or false; rather, in the defendant's view, it was "simply a prediction of future performance."

1095, (1991) ("A statement of belief may be open to objection * * * as a misstatement of the psychological fact of the speaker's belief in what he says.").

Defendant's reliance on *United States v. Rothhammer*, 64 F.3d 554, 557–58 (10th Cir. 1995) is also misplaced. In *Rothhammer*, the Tenth Circuit reversed a conviction under § 1014, holding that "a promise to pay in a promissory note is not a factual assertion" and that a promissory note creates a legal obligation that does not amount to a false statement. *Id*. *Rothhammer* is distinguishable from the case at hand because promissory notes and checks are commercial instruments that do not make factual statements of present intent and for which "the subjective intent of the maker is not relevant or material." *Id.* In contrast, a false promise or a person's statement that he intends to do something when he has no present intention of doing it—such as the covenant at issue in this case—is a false statement "because it falsely represents the state of his mind, and the state of his mind is a fact." *Shah*, 44 F.3d at 293 (quoting 37 *Am.Jur.2d*, Fraud and Deceit, § 60) (internal quotation marks omitted).

Next, Defendant briefly argues that there was insufficient evidence that the promise was false or that he understood it to be false. In his view, the fact that he did not approach Bank of America about the double pledge does not support an argument that he never intended to seek a release. This argument fails because a reasonable jury could find that based on the other evidence presented at trial and discussed above, including Defendant's dire financial condition and misrepresentations about the double-pledged TIF notes in JFA's presentation to Bank of America, that Defendant had no intention of fulfilling his promise to seek a release.

Finally, Defendant challenges the sufficiency of the evidence supporting the false statement charge in Count Sixteen. The allegedly false statement at issue in Count Sixteen is a provision in a construction loan agreement between Bank of America and Defendant's Streets of

Woodfield entities. The provision states: "Borrowers [Defendant's Streets of Woodfield entities] may make Distributions provided that * * * Borrowers' cash and cash equivalents remaining after such Distribution shall be not less than an amount equal to the aggregate of (A) the total amount of [tenant security deposits], (B) an amount sufficient to provide for the real estate taxes on the Premises * * * and (C) a reasonable working capital reserve." [GX 4/2/09 Amended Restated Construction Loan Agreement, ¶ 8.13(iii).] Defendant again argues that this was not a statement of fact capable of confirmation or contradiction. For the reasons discussed above, the Court rejects this argument, as the provision at issue was a false statement of present intent. The provision amounted to an agreement by Defendant to only take distributions from the Streets of Woodfield if the three stated conditions were met. The evidence shows that Defendant had no present intention of abiding by that agreement. Defendant made numerous and repeated withdrawals from the Streets of Woodfield accounts in violation of the provision before and after signing the loan agreement with the provision at issue, and a reasonable jury could infer that Defendant never intended to limit his distributions as provided in the agreement.

The Court also rejects Defendant's argument that there was insufficient evidence that he knew of this provision. Defendant contends that the Government only showed that Defendant signed the agreement and did not prove that he read and understood the provision at issue. This argument fails because a reasonable jury could conclude that Defendant, an experienced developer, understood the agreement that he executed.

Therefore, the Court concludes that Defendant is not entitled to a judgment of acquittal.

B. **Motion for a New Trial**

Federal Rule of Criminal Procedure 33(a) authorizes a district court to grant a timely request for a new trial "if the interest of justice so requires." *United States v. O'Malley*, 833 F.3d

810, 811 (7th Cir. 2016) (quoting Fed. R. Crim. P. 33(a)). "'[A] jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.'" *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (citation and internal quotation marks omitted). Instead, Rule 33(a) is "'reserved for only the most extreme cases.'" *Hagler*, 700 F.3d at 1101 (quoting *United States v. Linwood,* 142 F.3d 418, 422 (7th Cir. 1998)). "[C]ourts have interpreted the rule to require a new trial 'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989).

Defendant renews his challenge to the jury instructions given for the fraud counts (Counts One, Six, Seven, and Eight) and requests a new trial on each of these counts. To obtain a new trial based on incorrect jury instructions, Defendant must establish that "(1) the instructions did not accurately state the law, and (2) the error prejudiced [him] because the jury was likely to be misled or confused." *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 733 (7th Cir. 2013). The challenged jury instruction stated: "A materially false or fraudulent pretense, representation, or promise may be accomplished by the concealment of material information." Defendant argues that this instruction could have confused the jury into convicting on a fraud-by-omission theory, which the government conceded was not properly before the jury.

Defendant's argument fails because he has not established that the jury instruction did not accurately state the law. The challenged instruction closely tracks a pattern jury instruction and accurately stated the law. Pattern Criminal Jury Instructions of the Seventh Circuit (2012 ed.), The Committee on Federal Criminal Jury Instructions of the Seventh Circuit, at 396. Further, the Court already addressed Defendant's concern by deleting the reference to "omission" contained

in the pattern jury instruction.  See *id.* ("A materially false or fraudulent pretense, representation, or promise may be accomplished by *[an] omission[s]* or the concealment of material information." (emphasis added) (alteration in original)).

Finally, Defendant argues that he is entitled to a new trial with respects to Counts One, Six, Seven, Eight, Ten, and Eleven because the verdict for each of these counts is inconsistent with the not guilty verdicts returned by the jury for the remaining counts.  This argument fails because, as Defendant acknowledges, "[c]onsistency in the verdict is not necessary" and "[e]ach count in an indictment is regarded as if it was a separate indictment." *United States v. Dunn*, 284 U.S. 390, 393 (1932); see also *United States v. Wilbourn*, 799 F.3d 900, 911 (7th Cir. 2015) ("[T]he mere fact that verdicts are inconsistent with each other is of no legal significance unless a party can demonstrate that such verdicts cannot coexist by operation of law.").

For these reasons, the Court denies Defendant's motion for a new trial.

**III.  Conclusion**

For the foregoing reasons, the Court denies Defendant Freed's consolidated motion [134] for a judgment of acquittal and for a new trial.

Dated: November 9, 2016

_____
Robert M. Dow, Jr.
United States District Judge